**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PHOENIX ENTERTAINMENT PARTNERS, LLC, | |
| Plaintiff, | Case No.: 16-CV-4766 |
| v. | |
| O'TOOLE'S MANAGEMENT CONCEPT, INC., an Illinois Corporation, THREE 5 MEDIA, LLC., an Illinois limited liability company, and CHRISTOPHER R. CORBETT, an Illinois individual | |
| Defendants. | |

## COMPLAINT

The Plaintiff, Phoenix Entertainment Partners, LLC ("PEP"), by its undersigned counsel, hereby complains of Defendant O'Toole's Management Concept, Inc. ("O'Toole's"), Defendant Three 5 Media, LLC. ("Three 5 Media"), and Defendant Christopher R. Corbett ("Corbett" and collectively referred to as "Defendants") and for its Complaint hereby alleges as follows:

## JURISDICTION AND VENUE

1.  This is an action for trademark infringement and unfair competition arising under 15 U.S.C. §§ 1114 and 1125. This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

2.  This Court further has jurisdiction pursuant to 28 U.S.C § 1338(a), in that this civil action arises under an Act of Congress relating to trademarks, and, as to PEP's Lanham Act

unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark laws of the United States.

3.     This Court has supplemental jurisdiction over the subject matter of PEP's state law claim pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

4.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Christopher Corbett resides in Gurnee, Illinois, a city located within this judicial district, Three 5 Media, LLC. is an Illinois limited liability company with its principal place of business in Gurnee, Illinois, a city located within this judicial district and O'Toole's Management Concept, Inc. is an Illinois corporation with its principle place of business, Timothy O'Toole's Pub, in Gurnee, Illinois, a town located in this judicial district.

5.     This Court has personal jurisdiction over each Defendant, in that Christopher Corbett resides in this State and federal judicial district, Defendant Three 5 Media is located in this State and federal judicial district and Defendant O'Toole's and all Defendants conduct significant business here, and in that the acts of which the Defendants stand accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

6.     Plaintiff PEP is a North Carolina LLC having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

7.     Defendant Christopher R. Corbett ("Corbett") an Illinois individual, has an address in Gurnee, Illinois. Corbett has provided entertainment to certain venues including Timothy O'Toole's Pub in Gurnee, Illinois.

2

8.     Defendant Three 5 Media, LLC. ("Three 5 Media") is an Illinois limited liability company that has provided entertainment to certain venues including Timothy O'Toole's Pub in Gurnee, Illinois.

9.     Defendant O'Toole's Management Concept, Inc. ("O'Toole's") is an Illinois corporation that operates a restaurant called Timothy O'Toole's Pub in Gurnee, Illinois. O'Toole's operates a commercial establishment that provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.

## BACKGROUND FACTS

10.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

11.     The basic premise of a karaoke show is that the entity hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

12.     Generally, a "karaoke accompaniment track" is a re-recorded version of a popular song without the lead vocals in a specialized format that includes a graphical component containing a lyric display, cueing information, and other information.  The graphical component is synchronized to the music and is displayed to the patron who is performing and, typically, to the crowd as well.

13.     Venues that offer karaoke entertainment do so primarily as a free service, but with the commercial purpose of enticing patrons to come to their establishments and purchase food and beverages.

14. The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

15. PEP is the owner of SOUND CHOICE, a well-known and leading brand of karaoke accompaniment tracks that is particularly well known to commercial karaoke operations including bars, restaurants, and other venues as described above.

16. PEP has succeeded Slep-Tone Entertainment Corporation ("Slep-Tone"), by assignment, in all interest in the SOUND CHOICE brand.

17. Over the course of nearly three decades in business, Slep-Tone re-recorded and released in excess of 16,500 SOUND CHOICE-branded popular songs on special compact discs known as CD+G ("compact disc plus graphics") discs and, more recently, a subset of that catalog in another common karaoke format, MP3+G ("MP3 plus graphics").

18. SOUND CHOICE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers. According to some estimates, more than half of all accompaniment tracks played at karaoke shows in the United States originated from Slep-Tone's recordings.

19. The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

20. SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

21.	Slep-Tone and its successor PEP have released their karaoke tracks for commercial users <u>only</u> on compact discs[1] and not on any other form of carrier (such as computer hard drives or through internet downloads).

22.	Over time, however, it has become technologically possible to create karaoke accompaniment tracks, using the SOUND CHOICE CD-based tracks as a template, for storage on alternative media, such as computer hard drives.

23.	In most cases, the creation of such non-original tracks results in an imitation of a SOUND CHOICE track, which imitation is inferior to the original because of digital compression of the data as the format is converted from native CD+G audio and graphics to compressed audio and graphics.

24.	In a typical bar or restaurant environment, patrons are often unable to distinguish the imitation from an original, provided that the compression is not too aggressive, because the goal is to produce an acceptable digital substitute.

25.	The process outlined above is known as "media-shifting," because the information is being copied or shifted from one medium to another, and "format-shifting," because the information is being copied or shifted from one format to another.

26.	Media-shifting and format-shifting are undertaken for a number of purposes, some reasonable and others illicit.

27.	Users of karaoke accompaniment tracks usually find that the use of media-shifted tracks provides them with greater ease of use of the content, which can be stored on a hard drive and accessed quickly without having to insert discs into a player, and can protect the user's discs from excessive wear, damage, loss, or theft.

---

[1] In the beginning, Slep-Tone released its karaoke tracks on cassette tapes as well, but that technology was focused on the home consumer and has since become fully obsolete.

28. Prior to 2007, Slep-Tone prohibited media-shifting and format-shifting of its products entirely, and its products carried warnings against the unauthorized duplication that media-shifting and format-shifting require.

29. In order to enable legitimate owners of original discs the convenience of format-shifting and media-shifting, starting in 2009, Slep-Tone instituted a Media Shifting Policy ("MSP")—which PEP has continued—whereby legitimate owners could gain permission for media-shifting and format-shifting.

30. That policy requires disc owners to notify Slep-Tone of their intent to media-shift, or that they have completed a media-shift.

31. That policy also requires disc owners to maintain a condition known as "1-to-1 correspondence" between the discs they own and the media (such as hard drives) to which they media-shift.

32. For example, a disc owner who wants to have two hard drives with the same media-shifted content, the disc owner must own two original discs representing that content.

33. The policy also requires disc owners to undergo an audit of their holdings to verify 1-to-1 correspondence and the integrity of the media-shifted tracks.

34. The policy also requires disc owners to maintain ownership and possession of the discs and to put discs from which content has been media-shifted "on the shelf," i.e., out of use of any type while the content is media-shifted.

35. Unfortunately, easy electronic duplication of media-shifted tracks has resulted in the widespread distribution of media-shifted karaoke tracks unaccompanied by the ownership of any discs at all.

36. This distribution allows karaoke accompaniment track users to gain the benefit of what appear to be Slep-Tone karaoke tracks without paying for original discs.

37. Karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives at a show; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and to sell any original media they might have owned in the secondary market once they have media-shifted.

38. None of these activities are conducted with PEP's authorization, and none of these activities are accompanied by any sort of payment to PEP.

39. Instead, these activities have driven the demand for original discs down to uneconomically feasible levels, because it has become relatively easy to obtain illicitly, for free or at a nominal cost, products that if legitimate would cost tens of thousands of dollars when purchased at retail.

## THE RIGHTS OF THE PLAINTIFF

40. PEP is the owner of U.S. Trademark Registration No. 1,923,448, issued October 3, 1995, and renewed once, for the trademark SOUND CHOICE, for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

41. PEP is the owner of U.S. Trademark Registration No. 2,000,725, issued September 17, 1996, and renewed once, for a display trademark as follows:



for "pre-recorded magnetic audio cassette tapes and compact discs containing musical compositions and compact discs containing video related to musical compositions."

42.    PEP is the owner of U.S. Service Mark Registration No. 4,099,045, issued February 14, 2012, for the trademark SOUND CHOICE, for "conducting entertainment exhibitions in the nature of karaoke shows."

43.    PEP is the owner of U.S. Service Mark Registration No. 4,099,052, issued February 14, 2012, for the same display trademark as in paragraph 41, for "conducting entertainment exhibitions in the nature of karaoke shows"

44.    PEP and its predecessor have, for the entire time its marks identified above ("the SOUND CHOICE Marks") have been federally registered, provided the public, including the Defendants with notice of those federal registrations through the consistent display of the symbol ® with its marks as used.

45.    PEP is also the owner of distinctive and protectable trade dress associated with its graphical displays ("the Trade Dress").  This distinctive and protectable trade dress includes, at a minimum, (a) the use of a particular typeface, style, and visual arrangement in displaying the lyrics; (b) the SOUND CHOICE Marks; and (c) the use of particular styles in displaying entry cues for singers, namely a series of vanishing rectangles to indicate the cue.

46.    PEP and its predecessor have used its trade dress continuously and substantially exclusively for a period of decades.

47. The individual and collected elements of the Trade Dress have acquired secondary meaning as an indicator of PEP and its predecessor as a source, effectively functioning as a visual trademark.

48. The aforementioned trade dress serves to distinguish PEP's tracks from the tracks of their competitors, such that persons who are even minimally frequent consumers of karaoke entertainment services such as those provided by Corbett and Three 5 Media and O'Toole's are capable of identifying a particular karaoke track as originating with PEP simply by examining the Trade Dress or any significant portion thereof, whether or not the SOUND CHOICE Marks are also displayed.

49. The elements of the Trade Dress represent specific design choices by Slep-Tone; they are but three of many ways to convey the information necessary to permit a karaoke singer to be appropriately supported in his or her performance.

50. No competitor of PEP is required to use any element of the Trade Dress to accomplish the lyric cueing, and indeed all of the Plaintiff's known competitors are known to use other trade dress in accomplishing the lyric cueing.

## ACTIVITIES OF DEFENDANTS CORBETT AND THREE 5 MEDIA

51. Corbett and Three 5 Media provide karaoke services to venues in Gurnee, Illinois including Timothy O'Toole's Pub operated by Defendant O'Toole's, Inc.

52. On information and belief, in order to provide services, rather than using original karaoke discs that they possess (if they indeed possess such discs), Corbett and Three 5 Media rely upon one or more computer hard drives that store files representing karaoke accompaniment tracks.

53.     On information and belief, Corbett and Three 5 Media rely upon at least one such computer hard drive described in paragraph 52 herein.

54.     On information and belief, Corbett and Three 5 Media created, or directed another to create, or otherwise acquired from a third party the files that are stored on the computer hard drive.

55.     On information and belief, Corbett and Three 5 Media do not maintain a 1:1 correspondence relationship between the hard drives and original discs they might have lawfully acquired, if they indeed have any original discs.

56.     PEP or Slep-Tone did not authorize, cause, control, or know about the creation of the files stored on Corbett and Three 5 Media's computer hard drives at the time those files were so stored.

57.     On information and belief, many of the files stored on Corbett and Three 5 Media's computer hard drives are representative of karaoke tracks originally created by PEP or its predecessor Slep-Tone and are marked with the SOUND CHOICE Marks.

58.     When played as intended using appropriate software, those files cause the SOUND CHOICE Marks and the Trade Dress to be displayed as part of the associated video component of the karaoke tracks they represent.

59.     Neither PEP nor Slep-Tone authorized Corbett and Three 5 Media to create or use karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks or the Trade Dress and neither PEP nor Slep-Tone authorized Corbett and Three 5 Media to conduct entertainment services in the nature of karaoke shows in connection with the SOUND CHOICE Marks or the Trade Dress to the general public.

60.     As such, the placement of the SOUND CHOICE Marks and the Trade Dress upon Corbett and Three 5 Media's computer files is a false designation of the origin of those computer files.

61.     At all times relevant to the causes of action stated herein, Corbett and Three 5 Media have known that the creation and use of karaoke accompaniment tracks or computer files representative of karaoke accompaniment tracks that bear the SOUND CHOICE Marks and/or the Trade Dress is not authorized.

62.     Corbett and Three 5 Media's files, which function as karaoke accompaniment tracks, are also counterfeits of genuine SOUND CHOICE-branded tracks.

63.     A patron or unwitting customer of Corbett and Three 5 Media's, when confronted with the display of the SOUND CHOICE Marks and the Trade Dress at one of Corbett and Three 5 Media's shows, is likely to be confused into believing, falsely, that Slep-Tone or PEP created the tracks in use or authorized their creation.

64.     Corbett and Three 5 Media's use of the computer files representative of karaoke accompaniment tracks is commercial in nature because they are paid to provide access to and play those computer files and tracks at karaoke shows.

65.     Additionally, even if a particular counterfeit track is not played at a given show, the act of making that track available for play at a show is a commercial act for which Corbett and Three 5 Media are compensated and which inure to their benefit.

66.     On information and belief, Corbett and Three 5 Media's piracy of accompaniment tracks is not limited to SOUND CHOICE tracks, but extends to the piracy of numerous other manufacturers' tracks as well, on the same terms as above.

67.    On information and belief, the SOUND CHOICE Marks were displayed on video monitors during various songs played by Corbett and Three 5 Media.

68.    PEP obtained photographs and videos of displays of the SOUND CHOICE Marks.

69.    On information and belief, Corbett and Three 5 Media have not complied with PEP's MSP, and therefore the use of the SOUND CHOICE Marks were not authorized proper use.

**ACTIVITIES OF DEFENDANT O'TOOLE'S**

70.    O'Toole's hired Corbett and Three 5 Media to provide commercial karaoke services at its restaurant.

71.    O'Toole's has the right and ability to control whether its contractors use authentic or counterfeit materials to provide services.

72.    PEP or its representatives informed O'Toole's and its registered agent of the infringing and counterfeit character of O'Toole's contractor's karaoke accompaniment tracks. *See* Exhibit A.

73.    PEP offered O'Toole's the opportunity to enter into its Verified Compliance Safe Harbor Program, which is a free program that protects venues from liability for the acts of its contractors in exchange for requiring its contractors to provide information about their karaoke systems to enable PEP to assess whether those contractors are operating legally. *See id.*

74.    PEP also provides a certification program to karaoke operators as a means by which venues can determine, without significant inquiry, whether the karaoke operator they wish to hire is using authentic materials.

75. As a result of PEP's efforts, O'Toole's has actual knowledge of the infringing and counterfeit nature of Corbett and Three 5 Media's karaoke materials.

76. Despite that knowledge, O'Toole's refused to terminate Corbett and Three 5 Media's services.

77. Despite that knowledge, O'Toole's continued to receive a financial benefit from the provision of infringing karaoke services at their establishment by Corbett and Three 5 Media, through the attraction of paying patrons to their establishment.

78. As such, O'Toole's operated in actual or apparent partnership with Corbett and Three 5 Media, in a symbiotic relationship from which both benefit.

79. O'Toole's has also advertised its karaoke services, which services included the unlawful use of the Sound Choice Marks.

80. O'Toole's is liable for the acts of trademark infringement directly engaged in by Corbett and Three 5 Media on their respective premises or for their benefit.

## DAMAGES

81. Corbett and Three 5 Media's unauthorized use of PEP's trademarks has damaged PEP. Corbett and Three 5 Media have enjoyed years of revenues attributable in substantial part to its use of counterfeit SOUND CHOICE-branded karaoke tracks to provide karaoke services for money.

82. Corbett and Three 5 Media's illicit activities have also allowed them to compete unfairly against PEP's legitimate customers by lowering their cost of doing business through piracy of the music materials they use.

83.    Those illicit activities exerted illegitimate and unfair pressure upon the market for karaoke services in the areas in which Corbett and Three 5 Media operate by helping to crowd higher-cost but legitimate operators out of the market.

84.    Corbett and Three 5 Media's acts deprived PEP of revenue by discouraging legitimate operators from investing in legitimate SOUND CHOICE-branded products.

85.    O'Toole's's unauthorized use of and benefit from the use of the SOUND CHOICE Marks have damaged PEP both in the aggregate and individually.

86.    Upon information and belief, the Defendants have damaged PEP in an amount of at least $100,000.

87.    Moreover, by exerting illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the use of pirated material belonging to PEP and to other manufacturers, the Defendants have cost PEP, upon information and belief, in excess of $100,000 in revenue from legitimate sources crowded out of the market by the Defendants' piracy.

**FIRST CLAIM FOR RELIEF**
**TRADEMARK AND TRADE DRESS INFRINGEMENT**
**AGAINST DEFENDANTS CORBETT AND THREE 5 MEDIA**

88.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-87 of this Complaint.

89.    Corbett and Three 5 Media used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade

Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress during the provision of those services.

90. Corbett and Three 5 Media's use of the SOUND CHOICE Marks and Trade Dress was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

91. PEP did not license Corbett and Three 5 Media to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks and Trade Dress in connection with the services provided at their venue(s).

92. Use of the SOUND CHOICE Marks and Trade Dress in the manner attributable to Corbett and Three 5 Media is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which he performs into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

93. Corbett and Three 5 Media's acts were willful and knowing.

94. PEP has been damaged by infringing activities of Corbett and Three 5 Media.

95. Unless enjoined by the Court, Corbett and Three 5 Media's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**SECOND CLAIM FOR RELIEF**
**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**
**AGAINST DEFENDANTS CORBETT AND THREE 5 MEDIA**

96. PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-95 of this Complaint.

97. On each occasion when Corbett and Three 5 Media caused or permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, Corbett

and Three 5 Media caused or permitted the display of the SOUND CHOICE Marks in connection with Corbett and Three 5 Media's karaoke entertainment services.

98. The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Corbett and Three 5 Media's services and commercial activities.

99. The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Corbett and Three 5 Media for use in providing karaoke entertainment services.

100. Corbett and Three 5 Media's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Corbett and Three 5 Media had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

101. Because PEP has been denied this revenue, it has been damaged by Corbett and Three 5 Media's uses.

102. On each occasion when Corbett and Three 5 Media displayed an accompaniment track pirated from another manufacturer to be played during a karaoke show, Corbett and Three 5 Media caused the display of the words, names, and symbols of the other manufacturer in connection with Corbett and Three 5 Media's karaoke services.

103. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be

deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Corbett and Three 5 Media acquired in a legitimate manner.

104.    The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Corbett and Three 5 Media.

105.    Corbett and Three 5 Media's use of the false designations of origin in this fashion damages PEP by enabling Corbett and Three 5 Media to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

106.    The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

107.    Because PEP has been denied this revenue, it has been damaged by Corbett and Three 5 Media's false designations of origin relating to other manufacturers.

108.    Unless enjoined by the Court, Corbett and Three 5 Media's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**THIRD CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**AGAINST DEFENDANTS CORBETT AND THREE 5 MEDIA**

109.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-108 of this Complaint.

110.    Corbett and Three 5 Media used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress in

connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks or the Trade Dress during the provision of those services.

111. Corbett and Three 5 Media's acts of infringement occurred during the conduct of trade or commerce, from which Corbett and Three 5 Media derived an economic benefit.

112. Corbett and Three 5 Media's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

113. Corbett and Three 5 Media's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

114. As a direct and proximate result of each of Corbett and Three 5 Media's acts of infringement PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Corbett and Three 5 Media's acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

115. As such, PEP has been damaged and is likely to be further damaged by the deceptive trade practice of Corbett and Three 5 Media within the meaning of 815 ILCS § 510/3.

116. Unless enjoined by the Court, Corbett and Three 5 Media's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**FOURTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANTS CORBETT AND THREE 5 MEDIA**

117.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-116 of this Complaint.

118.    Corbett and Three 5 Media used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress, and by displaying the reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress during the provision of those services.

119.    Corbett and Three 5 Media's use of the SOUND CHOICE Marks and Trade Dress was "in commerce" within the meaning ascribed by Illinois common law.

120.    PEP did not license Corbett and Three 5 Media to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks and Trade Dress in connection with the services provided to its commercial establishments.

121.    Use of the SOUND CHOICE Marks and Trade Dress in the manner attributable to Corbett and Three 5 Media is likely to cause confusion, or to cause mistake, or to deceive customers at the venues in which Corbett and Three 5 Media perform into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

122.    Corbett and Three 5 Media's acts were willful and knowing.

123.    PEP has been damaged by infringing activities of Corbett and Three 5 Media.

124.    Unless enjoined by the Court, Corbett and Three 5 Media's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

**FIFTH CLAIM FOR RELIEF**

## TRADEMARK AND TRADE DRESS INFRINGEMENT
## AGAINST DEFENDANT O'TOOLE'S

125.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-124 of this Complaint.

126.    O'Toole's knowingly directly benefited from the use of, and through Corbett and Three 5 Media, used a reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress in connection with the provision of karaoke entertainment services, by displaying and permitting to be displayed the reproduction, counterfeit, or copy of the SOUND CHOICE Marks and/or the Trade Dress during the provision of those services.

127.    O'Toole's use of the SOUND CHOICE Marks and Trade Dress was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

128.    PEP did not license O'Toole's to make, acquire, or use reproductions, counterfeits, or copies, or to use the SOUND CHOICE Marks and Trade Dress in connection with the services provided at its commercial establishment.

129.    Use of the SOUND CHOICE Marks and Trade Dress in the manner attributable to O'Toole's is likely to cause confusion, or to cause mistake, or to deceive O'Toole's customers into believing that the services those customers are receiving are being provided with the authorization of PEP using bona fide, legitimate, authorized karaoke accompaniment tracks.

130.    O'Toole's acts were willful and knowing.

131.    PEP has been damaged by infringing activities of O'Toole's.

132.    Unless enjoined by the Court, O'Toole's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

## SIXTH CLAIM FOR RELIEF
## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

## AGAINST DEFENDANT O'TOOLE'S

133.     PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-132 of this Complaint.

134.     On each occasion when O'Toole's permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, O'Toole's permitted the display of the SOUND CHOICE Marks in connection with O'Toole's karaoke entertainment services.

135.     The display of the SOUND CHOICE Marks is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved O'Toole's services and commercial activities.

136.     The display of the SOUND CHOICE Marks is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by PEP and purchased by Corbett and Three 5 Media for use in providing karaoke entertainment services in a venue of O'Toole's.

137.     Corbett and Three 5 Media's use of the SOUND CHOICE Marks in this fashion would have inured to the benefit of PEP if Corbett and Three 5 Media had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

138.     Because PEP has been denied this revenue, it has been damaged by O'Toole's uses.

139.     On each occasion when O'Toole's permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, O'Toole's permitted the display

of the words, names, and symbols of the other manufacturer in connection with Corbett and Three 5 Media's karaoke services.

140. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Corbett and Three 5 Media acquired in a legitimate manner.

141. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Corbett and Three 5 Media.

142. O'Toole's use of the false designations of origin in this fashion damages PEP by enabling O'Toole's, through Corbett and Three 5 Media, to provide karaoke entertainment services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

143. The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

144. Because PEP has been denied this revenue, it has been damaged by O'Toole's false designations of origin relating to other manufacturers.

145. Unless enjoined by the Court, O'Toole's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**SEVENTH CLAIM FOR RELIEF**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**AGAINST DEFENDANT O'TOOLE'S**

146.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-145 of this Complaint.

147.    O'Toole's hired Corbett and Three 5 Media to provide commercial karaoke services at its establishment, and it had the right and ability to control the use of authorized or counterfeit materials for said commercial purposes.

148.    O'Toole's permitted Corbett and Three 5 Media to engage in acts of infringement of the SOUND CHOICE Marks and the Trade Dress, in derogation of PEP's common law and statutory rights in those marks.

149.    Corbett and Three 5 Media's acts of infringement occurred during the conduct of trade or commerce, from which O'Toole's derived an economic benefit.

150.    O'Toole's enabling Corbett and Three 5 Media's acts of infringement constitute unfair or deceptive acts or practices within the meaning of 815 ILCS § 510/1 et seq.

151.    O'Toole's enabling Corbett and Three 5 Media's acts of infringement caused likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

152.    As a direct and proximate result of each of Corbett and Three 5 Media's acts of infringement and O'Toole's encouragement thereof, PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Corbett and Three 5 Media's acts in creating or acquiring counterfeits of SOUND CHOICE-branded accompaniment tracks.

153.    As such, PEP has been damaged and is likely to be further damaged by the deceptive trade practice of Corbett and Three 5 Media, aided by O'Toole's encouragement, within the meaning of 815 ILCS § 510/3.

154.    Unless enjoined by the Court, Corbett and Three 5 Media's unfair competition activities, aided by O'Toole's encouragement, as described above will continue unabated and will continue to cause harm to PEP.

**EIGHTH CLAIM FOR RELIEF**
**COMMON LAW UNFAIR COMPETITION**
**AGAINST DEFENDANT O'TOOLE'S**

155.    PEP repeats and incorporates by reference herein its allegations contained in Paragraphs 1-154 of this Complaint.

156.    On each occasion when O'Toole's permitted a SOUND CHOICE-branded accompaniment track to be played during a karaoke show, O'Toole's permitted the display of the SOUND CHOICE Marks and/or Trade Dress in connection with Corbett and Three 5 Media's karaoke entertainment services.

157.    The display of the SOUND CHOICE Marks and Trade Dress is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that PEP sponsored or approved Corbett and Three 5 Media's services and commercial activities.

158.    The display of the SOUND CHOICE Marks and Trade Dress is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were

sold by PEP and purchased by Corbett and Three 5 Media for use in providing karaoke entertainment services in a venue of O'Toole's.

159. O'Toole's use of the SOUND CHOICE Marks and Trade Dress in this fashion would have inured to the benefit of PEP if Corbett and Three 5 Media had legitimately acquired genuine SOUND CHOICE discs instead of counterfeiting them or acquiring counterfeit copies, in that PEP would have received revenue from such sales.

160. Because PEP has been denied this revenue, it has been damaged by O'Toole's uses.

161. On each occasion when O'Toole's permitted an accompaniment track pirated from another manufacturer to be played during a karaoke show, O'Toole's permitted the display of the words, names, and symbols of the other manufacturer in connection with Corbett and Three 5 Media's karaoke services.

162. The display of these false designations of origin is likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the pirated tracks are legitimate, authorized, and authentic materials that Corbett and Three 5 Media acquired in a legitimate manner.

163. The display of the false designations of origin is also likely to cause confusion, or to cause mistake, or to deceive those present during the display, in that those present are likely to be deceived into believing, falsely, that the works being performed were sold by those manufacturers and purchased by Corbett and Three 5 Media.

164. O'Toole's use of the false designations of origin in this fashion damages PEP by enabling O'Toole's, through Corbett and Three 5 Media, to provide karaoke entertainment

services at a lower cost than persons who acquire those materials legitimately, including PEP's legitimate customers.

165. The consequential denial of revenue from a legitimate market for PEP's customers' services prevents PEP's customers from making purchases of material from PEP and is thus a denial of revenue to PEP.

166. Because PEP has been denied this revenue, it has been damaged by Corbett and Three 5 Media's false designations of origin relating to other manufacturers.

167. Unless enjoined by the Court, O'Toole's unfairly competitive activities as described above will continue unabated and will continue to cause harm to PEP.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff PEP prays for judgment against Corbett and Three 5 Media and O'Toole's and that the Court:

A. Find that Corbett and Three 5 Media and O'Toole's committed acts of infringement, including but not limited to counterfeiting and unlawful copying, of the federally registered SOUND CHOICE Marks and/or of the Trade Dress;

B. Find that Corbett and Three 5 Media and O'Toole's engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C. Enter judgment against Corbett and Three 5 Media and O'Toole's and in favor of PEP on all applicable counts;

D. Find the activities of Corbett and Three 5 Media and O'Toole's were in all respects conducted willfully and for profit;

E. Award to PEP the profits of Corbett and Three 5 Media and O'Toole's and the damages sustained by PEP because of the conduct of Corbett and Three 5 Media and O'Toole's

in infringing the SOUND CHOICE Marks, the SOUND CHOICE Trade Dress, or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting, and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

F.      Award to PEP the profits of Corbett and Three 5 Media and O'Toole's and the damages sustained by PEP because of Corbett and Three 5 Media's acts of unfair competition under 15 U.S.C. § 1125(a), and in any event in an amount not less than $50,000 for each establishment in which the infringement occurred, and in the amount of $100,000 from each of the Defendants;

G.      Award to PEP treble, punitive, or otherwise enhanced damages, as available, for acts of willful infringement by and in the amount of $100,000 from each of the Defendants;

H.      Grant PEP permanent injunctive relief against further infringement of the SOUND CHOICE Marks and Trade Dress by Corbett and Three 5 Media and O'Toole's;

I.      Award PEP its costs and attorney fees, to the extent not awarded above; and

J.      Grant PEP such other and further relief as justice may require.


Respectfully Submitted,

/s/ Vivek Jayaram, Esq.
Vivek Jayaram, Esq.
Jayaram Law Group, Ltd.
33 N. LaSalle Street
Suite 2900
Chicago, IL 60602
vivek@jayaramlaw.com
Tel: 312.454.2859
Fax: 312.551.0322
Counsel for the Plaintiff